# Central of Georgia Railway Co. *v.* Birmingham Sand & Brick Co.

## *Assumpsit.*

(Decided December 19, 1913.    64 South. 202.)

1. *Carriers; Freight; Persons Liable.*—A carrier may look either to the consignor, with whom the contract of shipment is made, or to the consignee, for the freight.

2. *Same; Liability of Consignee.*—The liability of a consignee for freight charges is not affected by the carrier waiving or losing its lien on the goods by delivery without first collecting the freight.

3. *Same; Rate.*—Under the Interstate Commerce Act, the freight rate of an interstate shipment is not that named in the bill of lading or contract of shipment, but the lawful rate existing at the time, whether or not such rate is known to the consignor or consignee, and regardless of whether the parties were misled by the carrier as to the lawful rate, or whether it had posted the lawful rate as required by the statute; hence, the carrier cannot by any act estop itself from demanding the lawful rate.

4. *Same; Failure to Post Rate.*—Under the Interstate Commerce Act the consignee cannot maintain an action against a carrier for damages for a failure to have the lawful rates posted and kept open to inspection by the public as required by said act.

5. *Set-Off and Counter Claim.*—Under section 5858, Code 1908, a defendant, when sued by a carrier for freight, may set off any demand which could be otherwise set off under the statute.

APPEAL from Birmingham City Court.

Heard before Hon. C. C. NESMITH.

Assumpsit by the Central of Georgia Railway Company against the Birmingham Sand & Brick Company. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

It is agreed in the above-styled cause that the following are the facts:    That during the years 1909 and 1910, defendant purchased from the Columbus Concrete Supply Company, of Columbus, Ga., certain car loads of sand, to wit, 63 car loads, which were shipped from the sand pit of the said Columbus Concrete Supply Co., at

Bull Creek, Ga., a station on the Seaboard Air Line Railway, via that line to Columbus, Ga., thence over plaintiff's line to Birmingham, Ala. That the shipment of each car was a separate and distinct transaction, and that the charges for freight on each car were demanded and collected by plaintiff's agent at Birmingham, Ala., upon the arrival of each car at Birmingham, Ala., and that the defendant paid plaintiff's agent the freight so demanded. That the said station at Bull Creek, Ga., on the Seaboard Railway, was a point at which the said carrier had no agent, and that the bills of lading for each shipment were prepared by plaintiff's authorized agent at Columbus, Ga., who placed therein the freight rate from said Bull Creek, Ga., to Birmingham, Ala. That the attached bill of lading, marked "Exhibit A" is a true and correct copy of the bills of lading issued by the plaintiff's agent, except that part as to name, date, car number and weights, for each of said shipments. Plaintiff's agent at Columbus, Ga., made a rate of 52½ cents per ton on said shipments in the year 1906. That this was done by plaintiff's agent upon the complaint made by the Columbus Concrete Supply Company in the said year to plaintiff's agent that it could not compete on business from its sand pit at Bull Creek, Ga., on the Seaboard Air Line to Birmingham, Ala., unless the Columbus Concrete Supply Company was given the same rate between said points as the plaintiff was charging for shipments from Bull Creek, Ga., on the Central of Georgia Railway, a station on plaintiff's line, adjacent to the station of the same name on the Seaboard Air Line Railway, from which shipments were made, which said rate was 52½ cents per ton, named to it by plaintiff's agent at Columbus, Ga., sold to defendant said cars of sand based on said freight rate and a fair profit, the freight charges to be paid by defendant,

and deducted in its settlement from amount due Columbus Concrete Supply Company guaranteeing the said rate to the defendant. That defendant made its contracts for sale of said sand, which was sold to numerous customers, at a price based upon the price paid the Columbus Concrete Supply Company, and the freight on said sand with a fair profit, and said sand was sold to defendant's customers at a profit greatly less than 27½ cents, the difference in rate now sought to be charged against defendant by plaintiff. That at this time defendant is without any recourse upon the said Columbus Concrete Supply Company, said company having ceased to exist, and that any amount or amounts which defendant might be forced to pay, on account of said cars of sand, by plaintiff, would be a loss to defendant. That no notice of any claim or error in the fixing, or charging of said rate of 52½ cents per ton has ever been made by plaintiff to defendant, other than that contained in a letter dated May 5, 1911, signed by the division counsel of plaintiff, mailed to defendant, stating that plaintiff had a claim against defendant for the amount sued for, and demanding payment, said demand by plaintiff being made long after defendant had made final settlement with its customers for said sand sold them at a price based upon the freight rate furnished by plaintiff's agent. It is further agreed that from Bull Creek, Ga., the station located on the Seaboard Air Line Railway, there was no lawful through rate on sand to Birmingham, Ala. That from Bull Creek, Ga., the station located on the Central of Georgia Railway, there was a lawful rate on sand of 52½ cents per ton to Birmingham, Ala., and that there was a lawful rate on sand from Columbus, Ga., to Birmingham, Ala., of 80 cents per ton. That if upon the foregoing statement of facts plaintiff is entitled to recover, it is entitled to recover

the sum of $682.38, with interest thereon from May 2, 1910.

LONDON & FITTS, for appellant. Under the Interstate Commerce Acts the freight rate is the lawful rate fixed for that class of interstate shipment, and not the rate that may have been inserted in the bill of lading or contract of shipment.—*Gulf, etc., Co. v. Hefley,* 158 U. S. 98; *Texas, et al. v. Mugg,* 202 U. S. 242; *Armour P. Co. v. U. S.,* 153 Fed. 1; *So. Ry. v. Harrison,* 119 Ala. 539. The waiver by the carrier of its lien for freight charges does not deprive it of the right to sue for such charges. —Elliott on Railroads, sec. 1571.

VASSAR L. ALLEN, and THOMAS J. WINGFIELD, for appellee. Having failed to publish and post its rates as required by the statute, and having quoted in its bill of lading or contract of shipment a lower rate, the defendant was prejudiced and damaged in the difference between the quoted rate, and the established rates, and was entitled to set the same off against the claim here sought.—*Ill. Cent. v. Henderson E. Co.,* 127 S. W. 779; *St. L., etc., Ry. v. Llewellen Bros.,* 113 C. C. A. 414. It must be conceded under these authorities that the plea of estoppel was proven, and was a complete defense. That appellant is guilty of having violated the law, and that if appellee had paid appellant's demands appellee would have had a right to recover same back as damages.

THOMAS, J.—This suit is on the common counts and on a special count setting out the facts, and is brought by the appellant, the Central of Georgia Railway Company, as a common carrier engaged in interstate commerce, to recover of defendant, as the consignee of several car load shipments of sand, the difference in the

[Central of Georgia Railway Co. v. Birmingham Sand & Brick Co.]

freight on the same, amounting in the aggregate to $682.38, between 52½ cents per ton, the rate of freight named in the several bills of lading on which the sand was shipped, and 80 cents per ton, the then existing lawful rate, from Columbus, Ga., where plaintiff received the shipments from the Seaboard Air Line Railway Company, to Birmingham, Ala., the point of destination, where plaintiff delivered the several shipments to defendant upon payment by the latter in each instance of only the freight named in the bill of lading, to wit, 52½ cents per ton. To the action, the defendant interposed a special plea (quoting) "in short by consent of all matters that may be specially pleaded, and especially all matters in estoppel." The case was tried by the court without the intervention of a jury and on an agreed statement of the facts, which are brief, and will be set out in the report of the case, except the bill of lading, attached thereto as an exhibit, which, being in the usual form, it is unnecessary to set out. From the judgment rendered in favor of the defendant, the plaintiff appeals, assigning as the only error the rendition of this judgment, and insisting that, under the law applicable to the agreed facts, the judgment should have been in its favor instead of in defendant's favor.

In the agreed statement of facts it is admitted by the defendant, among other things, that 80 cents per ton, and not 52½ cents per ton, as named in the bills of lading, was the lawful rate, which we take to mean the rate filed with and approved by the Interstate Commerce Commission and established as the existing rate at the time of the shipments in question.—U. S. Comp. Stat. 1901, p. 3155; U. S. Comp. Stat. Supp. 1909, p. 1153; U. S. Comp. Stat. Supp. 1911, p. 1309.

In general, the carrier has a right to look either to the consignor, with whom the contract of shipment is

made, or, as here, to the consignee, to whom the goods are actually delivered, for the freight thereon; and the liability of such consignee is not relieved by the fact that the carrier may have waived or lost its lien on the goods themselves, and the consequent right to subject them to the payment of the freight, by having delivered them without first having collected such freight.—6 Cyc. 500, and cases cited in note 3; Elliott on Carriers (2d Ed.) 1571. And, on account of the United States statutes hereinbefore cited, known as the Interstate Commerce Act and amendments thereto, it is settled by the authorities construing them that the rate of freight the carrier is entitled to and must collect on every shipment is measured, not by the rate which may have been named in the bills of lading or contracts of shipment, but by the lawful rate obtaining and in existence at the time; and this is true regardless of whether the consignor or consignee knew or not, at the time of shipment, of the lawful rate, and regardless of whether he may or not have been then misled to his hurt by the carrier as to the lawful rate, and regardless of whether the carrier kept or not, posted in its stations and open for public inspection, the lawful rate, as the act requires the carrier to do.—*Northern Ala. Ry. Co. v. Wilson Merc. Co., Infra,* 63 South. Rep. 34; *L. & N. R. R. Co. v. McMullen,* 5 Ala. App. 662, 59 South. 683; *Armour Packing Co. v. U. S.,* 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; *So. Ry. Co. v. Harrison,* 119 Ala. 546, 24 South. 552, 43 L. R. A. 385, 72 Am. St. Rep. 936; *Kansas City So. Ry. Co. v. Albers Com. Co.,* 223 U. S. 573, 32 Sup. Ct. 316, 56 L. Ed. 556; *U. S. v. Miller,* 223 U. S. 599, 32 Sup. Ct. 323, 56 L. Ed. 568; *Texas v. Mugg,* 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011; *Gulf City Co. v. Hefley,* 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; *Tex. & P. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U. S. 426, 27 Sup. Ct. 350,

51 L. Ed. 553, 9 Ann. Cas. 1075; *Texas Pacific Ry. Co. v. Cisco Oil Co.,* 204 U. S. 449, 27 Sup. Ct. 358, 51 L. Ed. 562; *Gerber v. Wabash R. Co.,* 63 Mo. App. 145; *St. Louis S. W. Ry. Co. v. Lewellen,* 192 Fed. 540, 113 C. C. A. 414; *Central of Ga. Ry. Co. v. Patterson,* 6 Ala. App. 494, 60 South. 465; *L. & N. R. R. Co. v. Jones,* 6 Ala. App. 617, 60 South. 945.

The necessary effect of all these decisions, construing and applying the Interstate Commerce Act, when considered together, is, in our opinion, that the carrier cannot, by any act, estop itself from exacting the lawful freight rate. If the carrier could so estop itself, then it would lie within the carrier's power, by purposely putting itself in a position where it could not exact the lawful rate of a shipper it desired to favor, to render nugatory one of the main designs of the act, the prevention of discrimination between shippers; and for the law to countenance the doctrine of estoppel in cases like this is for the law to say through the courts that the carrier is estopped from doing what the statute mentioned plainly requires that it must do—collect the lawful rate in all cases, and nothing greater and nothing less, by any means or device whatsoever. We cannot escape the conclusion that Congress impliedly intended by the act mentioned to deny to consignors and consignees the defense of estoppel when sued by the carrier for the lawful rate, since such a defense is entirely inconsistent with and destructive of the purposes of the act. Hence we pass over, without further consideration, defendant's plea and contention that the plaintiff is estopped by its acts from demanding the lawful freight, and we come to the last and only other proposition in the case, which is as to whether or not the defendant has, under the agreed statement of facts, a cause of action against the carrier which may be set off against the

demand of the carrier for the lawful freight in the present suit.

Section 5858 of the Code of Alabama provides that: "Mutual debts, liquidated or unliquidated, demands not sounding in damages merely, subsisting between the parties at the commencement of the suit, whether arising ex contractu or ex delicto, may be set off, one against the other, by the defendant," etc.; and that "such set-off, if found for the defendant, extinguishes, either in whole or in part, as the case may be, the plaintiff's demand," etc. We know of no reason why such a set-off, if the defendant has one, should not be as available to him, when sued by it for any other debt or demand; provided it is one of such a character as is cognizable before the state courts, and not one that is cognizable only before the United States Courts or the Interstate Commerce Commission.

The real question in the case is as to whether or not the defendant has such independent cause of action against the carrier. He predicates his contention that he has upon the agreed statement of facts, and upon the following provision of section 8 of the Interstate Commerce Act, to wit: "That in case any common carrier subject to the provisions of this act shall do, cause to be done, or permit to be done any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation," etc.—and upon certain provisions of sections 9 and 22 of said act, where, after providing, among other things, that any person or persons claiming to be damaged by such carrier might either make complaint before the Interstate Commerce Commission or

[Central of Georgia Railway Co. v. Birmingham Sand & Brick Co.]

bring suit in his or their own behalf for such damages in any district or circuit court of the United States, it is further provided that "nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies."

The only authorities cited us in support of this contention are the cases of *Ill. Cent. Ry. Co. v. Henderson*, 138 Ky. 220, 127 S. W. 779, and *St. Louis Ry. Co. v. Lewellen*, 192 Fed. 540, 113 C. C. A. 414—the first decided by the Court of Appeals of Kentucky, and the latter by the United States Circuit Court of Appeals—where, in construing the above-mentioned sections of the Interstate Commerce Act, it was held that, when the carrier fails to post and keep open to public inspection, as required by the act, the lawful rate, the carrier is, although it is entitled to recover the lawful rate, yet liable in an independent action to the shipper, who does not know, and is thus by the fault of the carrier deprived of the means of knowing, the lawful rate, for any proximate damages the shipper may sustain as a result of relying in good faith on a less rate quoted him by the carrier. We find, however, that the first mentioned of the two cited cases was expressly, and the latter impliedly, repudiated by the Supreme Court of the United States, who reversed the former case on writ of error.—*Ill. Cent. Ry. Co. v. Henderson*, 226 U. S. 441, 33 Sup. Ct. 176, 57 L. Ed. 290. See also, *K. C. R. R. Co. v. Carl*, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. Ed. 683; *St. Louis Ry. Co. v. Burckett*, 229 U. S. 603, 33 Sup. Ct. 773, 57 L. Ed. 1347. These decisions of the Supreme Court of the United States, together with their decisions in the cases of *Texas Ry. Co. v. Cisco Oil Co.*, U. S. 449, 27 Sup. Ct. 358, 51 L. Ed. 562, and *Texas v. Mugg*, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011,

and *Kansas City Ry. Co. v. Albers Comm. Co.*, 223 U. S. 573, 32 Sup. Ct. 316, 56 L. Ed. 556, clearly show, without the necessity of further discussion, that under the agreed facts in the case at bar, the defendant has no right of action against the plaintiff carrier, and this irrespective of whether the lawful rate was at the time of shipment posted and kept open to public inspection by the carrier or not.

It follows from what we have said that the trial court erred, therefore, in rendering judgment for the defendant. That judgment is consequently reversed, and one will be here rendered for the plaintiff, under the agreed facts, for $682.38, with interest thereon from May 2, 1910.

Reversed and rendered.